# Exhibit A

## Case Information

CC-19-00988-C | WILLIAM PAUL BURCH vs. JP MORGAN CHASE BANK N.A.

| Case Number | Court | Judicial Officer |
| --- | --- | --- |
| CC-19-00988-C | County Court at Law No. 3 | MONTGOMERY, SALLY |
| File Date | Case Type | Case Status |
| 02/14/2019 | OTHER (CIVIL) | CLOSED |

## Party

PLAINTIFF
BURCH, WILLIAM PAUL

Address
P.O. BOX 201236
ARLINGTON TX 76006

Active Attorneys
Pro Se

DEFENDANT
JP MORGAN CHASE BANK N.A.

Address
SERVE ITS REGISTERED AGENT:CT CORPORATION SYSTEM
1999 BRYAN STREET, SUITE 900
DALLAS TX 75201

Inactive Attorneys
Lead Attorney
LEWIS, WILLIAM LANCE
Retained

Work Phone
214-871-2100

Fax Phone
214-871-2111

## Events and Hearings

02/14/2019 NEW CASE FILED (OCA)

02/14/2019 ORIGINAL PETITION

ORIGINAL PETITION

02/14/2019 AFFIDAVIT INABILITY TO PAY

AFFIDAVIT INABILITY TO PAY

02/14/2019 ISSUE CITATION

ISSUE CITATION

02/15/2019 CITATION (SERVICE)

Anticipated Server
CONSTABLE 1

Anticipated Method
Actual Server
CONSTABLE 1

Returned
02/27/2019

02/27/2019 RETURN OF SERVICE

RETURN OF SERVICE

Comment
WRIT OF GARNISHMENT AFTER JUDGMENT SERVED ON 2/19/2019 @3:40PM

03/15/2019 NOTICE - REMOVAL TO FEDERAL COURT

NOTICE OF REMOVAL TO FEDERAL COURT

ORDER TO CLOSE FILE - FEDERAL COURTS

03/15/2019 PROPOSED ORDER

PROPOSED DEFAULT JUDGMENT

Comment
PROPOSED DEFAULT JUDGMENT

03/15/2019 APPLICATION

APPLICATION FOR ENTRY OF DEFAULT

Comment
FOR ENTRY OF DEFAULT

03/20/2019 MOTION - DEFAULT JUDGMENT

MOTION FOR DEFAULT JUDGMENT

03/29/2019 ORDER - REMOVAL (FEDERAL COURT)

ORDER - REMOVAL (FEDERAL COURT)

## Financial

BURCH, WILLIAM PAUL

| | |
|---|---|
| Total Financial Assessment | $361.00 |
| Total Payments and Credits | $361.00 |

| | | |
|---|---|---|
| 2/14/2019 | Transaction Assessment | $277.00 |
| 2/15/2019 | Transaction Assessment | $84.00 |
| 2/15/2019 | INABILITY TO PAY | ($361.00) |

## Documents

ORIGINAL PETITION

AFFIDAVIT INABILITY TO PAY

ISSUE CITATION

RETURN OF SERVICE

NOTICE OF REMOVAL TO FEDERAL COURT

ORDER TO CLOSE FILE - FEDERAL COURTS

PROPOSED DEFAULT JUDGMENT

APPLICATION FOR ENTRY OF DEFAULT

MOTION FOR DEFAULT JUDGMENT

ORDER - REMOVAL (FEDERAL COURT)

# Exhibit B

FILED
3/15/2019 8:19 AM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

Cause No. CC-19-00988-C

| | | |
|---|---|---|
| William Paul Burch, | § | In County Court at Law |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Number Three |
| | § | |
| JP Morgan Chase Bank, N.A., | § | |
| | § | |
| Defendant. | § | |
| | § | of Dallas County, Texas |

---

DEFENDANT JPMORGAN CHASE BANK, N.A.'S
NOTICE OF FILING NOTICE OF REMOVAL

---

PLEASE TAKE NOTICE that defendant JPMorgan Chase Bank, N.A. filed a notice of removal in the Office of the Clerk of the United States District Court for the Northern District of Texas, Dallas Division. A copy of that notice of removal is attached.

PLEASE TAKE FURTHER NOTICE that under 28 U.S.C. § 1446 the filing of the notice of removal in the United States District Court for the Northern District of Texas, Dallas Division, together with the filing of this notice with the Clerk of this Court effects the removal of the above-styled action to the United States District Court, and this Court may proceed no further unless and until the case is remanded.

Respectfully submitted,

*/s/ Wm. Lance Lewis*

WM. LANCE LEWIS
Texas Bar No. 12314560
R. KENDALL YOW
Texas Bar No. 24066806
QUILLING, SELANDER, LOWNDS,
WINSLETT & MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
214-880-1833 Telephone
214-871-2111 Facsimile
llewis@qslwm.com
kyow@qslwm.com

ATTORNEYS FOR DEFENDANT
JPMORGAN CHASE BANK, N.A.

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served on all parties in accordance with the Texas Rules of Civil Procedure on March 15, 2019.

William P. Burch
P.O. Box 201236
Arlington, Texas 76006

*/s/ R. Kendall Yow*
R. Kendall Yow

# EXHIBIT A

Case 3:19-cv-00645-N Document 1 Filed 03/15/19 Page 1 of 4 PageID 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| William Paul Burch, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:19-cv-00645 |
| | § | |
| JP Morgan Chase Bank, N.A., | § | |
| | § | |
| Defendant. | § | |

---

DEFENDANT JPMORGAN CHASE BANK, N.A.'S NOTICE OF REMOVAL

---

Defendant JPMorgan Chase Bank, N.A. (Chase), incorrectly sued as "JP Morgan Chase Bank, N.A.," files its notice of removal of this action from County Court at Law Number Three of Dallas County, Texas to the United States District Court for the Northern District of Texas, Dallas Division, the Court for the District and Division encompassing the place where the lawsuit is currently pending. This notice of removal is filed pursuant to 28 U.S.C. §§ 1441 and 1446. In support hereof, Chase respectfully shows as follows:

1. On February 14, 2019, plaintiff William Paul Burch (Burch or Plaintiff) filed Plaintiff's Original Petition for Quiet Title (the Complaint) captioned *William Paul Burch v. JP Morgan Chase Bank, N.A.*, which was assigned cause number CC-19-00988-C, in County Court at Law Number Three of Dallas County, Texas, where it is now pending.

2. Chase was served with citation on February 19, 2019. Removal is timely because thirty days have not elapsed since Chase was served with a summons or citation. 28 U.S.C. §1446(b)(1); *Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999) (holding that the thirty-day deadline to remove begins on the date the summons or citation is served even

if the complaint is received at a prior date). In fact, thirty days have not elapsed since Burch filed the Complaint.

3. A copy of this notice of removal will be filed with County Court at Law Number Three of Dallas County, Texas and served on Burch.

4. In accordance with Local Rule 81.1, attached collectively as Exhibit A are all materials filed in the state court.

5. Chase also filed contemporaneously with this notice a civil cover sheet, a supplemental civil cover sheet, and a separately signed certificate of interested persons and disclosure statement that complies with Local Rule 3.1(c) and Federal Rule of Civil Procedure 7.1.

## GROUND FOR REMOVAL: DIVERSITY

6. This Court has original jurisdiction over this case under 28 U.S.C. § 1332 because this is a civil action between citizens of different states where the matter in controversy exceeds $75,000.

(a) The amount in controversy exceeds the federal minimum jurisdictional requirements.

7. Burch asserts against Chase trespass to try title[1] and quiet title[2] claims seeking a determination of title to the real property located at 2531 Gerry Way, Lancaster, Texas 75134 (the Property) and judgment removing a certain deed of trust lien as an encumbrance against the Property. Because a trespass to try title claim seeks a determination of title to real property, the

[1] Ex. A-2 ¶ 16 ("Moreover, while the statute of limitations for a voidable lien is four-years, 'the rule is well established in Texas that where a deed is absolutely void, a suit in law in trespass to try title may be maintained to recover the land.' . . . . In this case, taking Plaintiff's allegations as true, as the Court must, the lien in question was void from its inception. Accordingly. this suit is not barred by limitations.").

[2] Ex. A-2 ¶ 19 ("Lien released on property immediately in favor of plaintiff immediately.").

amount in controversy includes the property's value. *Groves v. Rogers*, 547 F.2d 898, 900 (5th Cir. 1977).

8. According to the Dallas Central Appraisal District, the property's assessed value for tax purposes is $105,290.[3]

9. Burch also seeks unspecified damages, punitive damages, attorney's fees, and court costs.[4] Accordingly, the amount in controversy in this matter meets and exceeds the federal jurisdictional minimum of $75,000, exclusive of interest and costs.

(b) Complete diversity exists between Burch and Chase.

10. For diversity purposes, an individual is a citizen of the state of his domicile, which is the place of his true, fixed, and permanent home and principal establishment to which he has the intention of returning whenever he is absent therefrom. *See Stine v. Moore*, 213 F.2d 446, 448 (5th Cir. 1954). Burch alleges he "is an individual residing in Grand Prairie, at 5947 Waterford Dr, Grand Prairie, Texas 75052."[5] Thus, Burch is a citizen of Texas.

11. Under the diversity statute, a national banking association is deemed a citizen of the state in which it is located. 28 U.S.C. § 1348. For purposes of 28 U.S.C. § 1348, a national bank is a citizen of the state in which its main office, as set forth in its articles of association, is located. *See Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303 (2006). Chase is a national

---

[3] *See* Ex. B. Chase requests that the Court take judicial notice of the Property's appraised value. "District courts have routinely relied on [appraisal district's valuation] to establish the amount in controversy." *Dunn v. Midland Mortg.*, Civ. A. H-13-3516, 2014 WL 683854, at *2 (S.D. Tex. Feb. 20, 2014) (citing *Hearn v. Deutsche Bank Nat'l Trust Co.*, 2013 WL 6079460, at *4 (N.D. Tex. Nov. 18, 2013) (collecting cases holding appraisal valuations as competent evidence to establish the amount in controversy)); *Kew v. Bank of Am., N.A.*, No. H-11-2824, 2012 WL 1414978, at *3 n.4 (S.D. Tex. Apr. 23, 2012) (noting that a court may take judicial notice of the appraised fair-market value of property under Rule 201 because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned and also noting that a "printout from the Harris Central Appraisal District's website is a public record under Rule 803(8)").

[4] *See* Ex. A-2 ¶ 20.

[5] *See* Ex. A-2 ¶ 2.

association. When Burch filed this suit and at all times since, Chase's main office, as designated by its articles of association, has been in Columbus, Ohio. Thus, Chase is a citizen of Ohio.

12. Accordingly, because the amount in controversy exceeds $75,000, Burch is a citizen of Texas, and Chase is a citizen of Ohio, this Court has original jurisdiction over the present action under 28 U.S.C. § 1332. Removal is therefore proper.

Wherefore, Chase prays that the above-described action now pending in County Court at Law Number Three of Dallas County, Texas be removed to this Court.

Respectfully submitted,

*/s/ Wm. Lance Lewis*

WM. LANCE LEWIS
Texas Bar No. 12314560
R. KENDALL YOW
Texas Bar No. 24066806
QUILLING, SELANDER, LOWNDS, WINSLETT & MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
214-880-1833 Telephone
214-871-2111 Facsimile
llewis@qslwm.com
kyow@qslwm.com

ATTORNEYS FOR DEFENDANT
JPMORGAN CHASE BANK, N.A.

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served on all parties in accordance with the Federal Rules of Civil Procedure on March 15, 2019.

William P. Burch
P.O. Box 201236
Arlington, Texas 76006

*/s/ R. Kendall Yow*
R. Kendall Yow

# Exhibit C

# IN THE COUNTY COURT AT LAW NUMBER 3 OF DALLAS COUNTY. TEXAS

| | | |
|---|---|---|
| **WILLIAM PAUL BURCH,** | § | |
| **Plaintiff,** | § | **CASE NO. CC-19-00988-C** |
| | § | |
| **vs** | § | |
| | § | |
| **JP MORGAN CHASE BANK, N.A.** | § | |
| | § | |
| **Defendants** | § | |

## APPLICATION FOR ENTRY OF DEFAULT

COME NOW the Plaintiff, William Paul Burch and requests the Clerk pursuant to Rule 27.003, Texas Rules of Civil Procedure, to enter default on the Defendant, JP Morgan Chase Bank, N. A., in the above entitled action for failure to answer or otherwise defend as to Plaintiff's Complaint, or serve a copy of any Answer or other defense which he might have upon the undersigned Pro-Se Plaintiff..

A copy of the Summons, together with a copy of the Complaint, was served upon the Defendant by a Dallas County Constable was requested on February 15, 2019. Pursuant to Rule 27.003, Texas Rules of Civil Procedure, service of process was deemed complete on delivery on February 18, 2019.

That this Application is executed by affiant herein in accordance with Rule 27.003, Texas Rules of Civil Procedure, for the purpose of enabling the Plaintiff to obtain an entry of default against the Defendant for his failure to answer of otherwise defend as to the Plaintiff's Complaint.

Dated: March 15, 2019

Respectfully submitted,

/s/William Paul Burch

William Paul Burch-Pro Se
P. O. Box 201236
Arlington, Texas 76006
817-919-4853
billburch@worldcrestauctions.com



Copy from re:SearchTX

# CONSTABLE'S RETURN

**Style of Case:** **WILLIAM PAUL BURCH VS. JP MORGAN CHASE BANK N.A.**

*Came into hand, this* **18** *day of* **FEBRUARY** **,20 19** *AT* **10:37** *o'clock* **A** *M.* *by executing and delivering a* **CITATION** *issued out of the state of* **TEXAS** *under cause number:* **CC-19-00988-C** **19** day **FEBRUARY** *,* **20 19** *, at* **3:40** *o'clock* **P** M., to:

☐ ______ *personally delivered/served true and correct copies of same.*

**OTHER NOTES:** ______

☐ ______ *pursuant to Rule 106/Rule 536, to an occupant:* ______ *over the age of 16 years.*

☐ ______ *pursuant to Rule 106/Rule 536, by securely attaching and/or affixing to the* ______ *of the defendant's last known place of* ☐ *business* ☐ *abode.*

☐ **JP MORGAN CHASE BANK N.A.** ☐ **A Corporation** ☐ **A Business**

**Name:** **C T CORPORATION SYSTEM** ☐ **President** ☐ **Vice-President** ☒ **Registered Agent**

☒ **By delivering to the defendant's registered agent for service, C.T. CORPORATION SYSTEM, through Their authorized agent to accept service: MELISSA TORRES SOP INTAKE ASSOCIATE**

**at 1999 BRYAN ST STE 900 Dallas, Texas 75201.**

**Service Address:** **1999 BRYAN ST STE 900 DALLAS TEXAS 75201**

☐ **RETURNED TO COURT AND/OR PLAINTIFF FOR THE FOLLOWING REASONS:**

______

______

**Service Fees: $ 80.00**

[signature] #135

**M. JOHNSON #135 DEPUTY CONSTABLE**
**TRACEY L. GULLEY, CONSTABLE**
**DALLAS COUNTY PRECINCT 1**

**COUNTY OF DALLAS**

**STATE OF TEXAS**

**SIGNED AND SWORN BY SAID** ______ **,before me, this** ______

**Day Of** ______ **20** ____ **, to certify which, witness my hand and seal of office.**

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS

2019 FEB 27 AM 11:17

______
**NOTARY PUBLIC-IN AND FOR THE STATE OF TEXAS**



Copy from re:SearchTX

009011

# THE STATE OF TEXAS
# CITATION

CAUSE NO. CC-19-00988-C
COUNTY COURT AT LAW NO. 3
Dallas County, Texas

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS
2019 FEB 27 AM 11: 17

**PCT 1**

**CITATION**
**PLAINTIFF'S ORIGINA; PETITION FOR QUIET TITLE**
**CC-19-00988-C**

IN THE COUNTY COURT OF DALLAS
County Court at Law No. 3
Dallas County, Texas

WILLIAM PAUL BURCH, ***Plaintiff(s)***

**VS.**

JP MORGAN CHASE BANK N.A., ***Defendant(s)***

**SERVE:**
**JP MORGAN CHASE BANK N.A.**
**SERVE ITS REGISTERED AGENT**
**CT CORPORATION SYSTEM**
**1999 BRYAN STREET SUITE 900**
**DALLAS TX 75201**

**ISSUED THIS**
**15TH DAY OF FEBRUARY, 2019**

JOHN F. WARREN, COUNTY CLERK
BY: GUISLA HERNANDEZ, DEPUTY

Attorney for Plaintiff- Pro Se
WILLIAM PAUL BURCH
5947 WATERFORD DR
PO BOX 201236
ARLINGTON TX 76006
817-919-4853

**TO:**

**JP MORGAN CHASE BANK N.A.**
**SERVE ITS REGISTERED AGENT**
**CT CORPORATION SYSTEM**
**1999 BRYAN STREET SUITE 900**
**DALLAS TX 75201**

"You have been sued. You may employ an attorney. If you or your Attorney do not file a WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and PLAINTIFF'S ORIGINA; PETITION FOR QUIET TITLE, a default judgment may be taken against you." Your answer should be addressed to the clerk of County Court at Law No. 3 of Dallas County, Texas at the Court House of said County, 600 Commerce Street, Suite 101, Dallas, Texas 75202.

RECEIVED
CONSTABLE OFFICE PCT
2019 FEB 18 AM 10: 37
7201 S POLK ST
DALLAS, TEXAS

**WILLIAM PAUL BURCH**
***Plaintiff(s)***

**VS.**

**JP MORGAN CHASE BANK N.A.**
***Defendant(s)***

filed in said Court on the 14th day of February, 2019a copy of which accompanies this citation.

**WITNESS: JOHN F. WARREN**, Clerk of the County Courts of Dallas County, Texas. GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Dallas, Texas, and issued this 15th day of February, 2019 A.D.

JOHN F. WARREN, Dallas County Clerk

By *Guisla Hernandez*, Deputy
Guisla Hernandez

COUNTY COURT OF DALLAS COUNTY, TEXAS

OFFICER'S FEES HAVE BEEN COLLECTED BY DALLAS COUNTY CLERK



Copy from re:SearchTX

# OFFICER'S RETURN

CC-19-00988-C County Court at Law No. 3

WILLIAM PAUL BURCH vs. JP MORGAN CHASE BANK N.A.

**ADDRESS FOR SERVICE:**
SERVE ITS REGISTERED AGENT CT CORPORATION SYSTEM
1999 BRYAN STREET SUITE 900
DALLAS TX 75201

**Fees:**

Came to hand on the _____day of FEB 18 2019, 20________, at _____o'clock _____.m., and executed in _____________ County, Texas by delivering to JP MORGAN CHASE BANK N.A. in person, a true copy of this Citation together with the accompanying copy of the PLAINTIFF'S ORIGINA; PETITION FOR QUIET TITLE with the date and service at the following times and places to-wit:

| Name | Date/Time | Place, Course and Distance from Courthouse |
| --- | --- | --- |
| | | |
| | | |

And not executed as to the defendant(s). ____________________

The diligence used in finding said defendant(s) being:

____________________

and the cause or failure to execute this process is:

____________________

and the information received as to the whereabouts of said defendant(s) being:

____________________

Serving Petition and Copy $________

Total $________

TRACEY GULLEY, CONSTABLE
DALLAS COUNTY PRECINCT 1, Officer

____________________, County, Texas

By:____________________, Deputy

____________________, Affiant



Copy from re:SearchTX

# Exhibit D

FILED
3/20/2019 4:05 PM
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

# IN THE COUNTY COURT AT LAW NUMBER 3 OF DALLAS COUNTY. TEXAS

| | | |
|---|---|---|
| WILLIAM PAUL BURCH, | § | |
| Plaintiff, | § | CASE NO. CC-19-00988-C |
| | § | |
| vs | § | |
| | § | |
| JP MORGAN CHASE BANK, N.A. | § | |
| | § | |
| Defendants | § | |

# PLANTIFF'S MOTION FOR ENTRY OF DEFAULT AND FOR DEFAULT JUDGEMENT

TO THE HONORABLE SALLY MONTGOMERY, COUNTY COURT JUDGE:

COMES NOW, WILLIAM PAUL BURCH, Plaintiff, moves for entry of default and for default judgment. Defendants' answer was due on March 11, 2019 and has not been filed. In support, Plaintiff respectfully shows the following:

## I. SUMMARY

The Defendants in this case have defaulted. Therefore, Plaintiff requests that this Court grant the judgment prayed for in her Original Petition.1 As stated in the Original Petition, Plaintiff prays for the following relief:

WHEREFORE, Plaintiff demands

A. Removal of any lien and securing Deed of Trust secured by the residence located at 1713 Enchanted Ln, Lancaster, Texas 75146 in Dallas County, Texas currently held by JP Morgan Chase Bank, N.A. or its successors and assigns.

B. A cash judgement for expenses to repair the property of $5,600 payable to Plaintiff .

## III. HISTORY

4. In 2008 Plaintiff was informed that, as a result of a downturn in the market, the value of his property was less than the balance on his Mortgage Note. The Mortgage Company wanted the property back or they wanted the Plaintiff to pay the difference. Another option was for the Plaintiff to file for Chapter 11 bankruptcy so that he could modify the loan (loan modification was not allowed under the law at the time for income properties outside of bankruptcy).

5. The Plaintiff elected to file for Chapter 11 Bankruptcy. The Mortgage Company participated in the Plan by having their attorneys help write the Plan. The confirmed plan voided the old note and called for a new Note to be produced within six months of the confirmation of the plan (December 2009). All liens pass through in tack to confirmation unless there are provisions in the confirmed plan that changes the Mortgage (1)

6. The Mortgage Note holder then took the voided note and collected the full-face value from the Private Mortgage Insurance company (PMI) which is allegedly American International Group, Company (AIG). PMI, also known as private mortgage insurance, is a type of mortgage insurance from private insurance companies used with conventional loans. Like other kinds of mortgage insurance policies, PMI protects the lender if the debtor stops making payments on your home loan. PMI can be arranged by the lender and provided by private insurance companies.

7. Plaintiff believes this was done because if the Mortgage Company followed the plan then they would have to reduce the value of their holding and take a risk on a potential bad loan. By going to the PMI, they would receive full face value and would have the opportunity to buy the loan back from the PMI at generally ten percent of the face value.

8. So that they could continue to collect on the loan or sell it for ten times what they had paid for it. With most loans that have issues, the Mortgage Note is still valid when the Mortgage Company goes to the PMI. Therefore, when the Mortgage Company buys the loan back, or another company buys the loan, then they are buying a valid note. Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor. (2)

9. However, with this note both the terms and the face value were changed. Therefore, when attempting to collect on the debt, the collections department assumed that the Plaintiff was not paying according to the terms of the note. Further, since there was no longer any requirement for escrow, the escrow department went to the collections department and demanded payment of escrow. In a Chapter 11 bankruptcy, the confirmed plan provisions bind both the debtor and the mortgage holder. (3) Because they were attempting to collect on an invalid lien, payment amounts from the Plaintiff were either misapplied or returned. In either case it led to foreclosure or attempted foreclosure.

10. Once the six months had passed, the Mortgage Company could no longer collect on the debt because there was no Mortgage Note. A claim, proof of which is filed under section

---

(1) Dewsnup v. Timm, 502 U.S. 410, 417 (1992)
(2) 11 USC § 1141
(3) 11 USC § 1141 (a)

501, is deemed allowed except to the extent that proof of such claim is not timely filed as was the case of the new replacement Mortgage Note which was never filed. (4) The Plaintiff, who had been telling the Mortgage Company every month about the conditions of the Plan, sent the Mortgage Servicer a letter notifying them that they no longer had a valid note and should remove the lien from the public records.

11. The Second Circuit held that a confirmed Chapter 11 plan can extinguish a lien if "(1) the text of the plan does not preserve the lien; (2) the plan is confirmed; (3) the property subject to the lien is 'dealt with' by the terms of the plan; and (4) the lienholder participated in the bankruptcy proceedings." All four are dealt with. (5)

12. The Mortgage Servicing Company continued to try to collect on a note that they knew was no longer valid. They frequently applied pressure of various types, that created enough stress that the Plaintiff had a heart attack. Plaintiff attempted to work out a deal with the Mortgage Company and even agreed to a second bankruptcy. But the Mortgage Company would not cooperate and even put road blocks in front of the Plaintiff to prevent his selling the property.

## IV. WORDING REMOVING LIEN FROM PLAN

13. In Cause number 08-45761-RFN, confirmed on December 09, 2009. It was ruled:

A. Class 10 Claimant (Allowed Secured Claims of Litton Loan Servicing) is impaired and shall be satisfied as follows: Litton Loan Servicing (Litton) is the mortgage holder on the property located at 2531 Gerry Way, Lancaster, Texas (the" Litton property"). Based upon the Debtors' current value of the Gerry Way property, the Debtor will enter into a New Gerry Way Note in the original amount of $33,000 ("New Gerry Way Note"). The Gerry Way Note shall bear interest at the rate of 5.1% per annum. The Debtor shall pay the new Gerry Way Note in 360 equal monthly payments of $195.86 commencing on the Effective Date. Class 10 is impaired under this Plan. (6)

Payments were made but returned. The lender had six months to produce a new note:

B. 12.3 All property of the Reorganized Debtors is free and clear of all Claims and interests of Creditors and Equity Interest Holders, except as to claims, secured claims or secured debentures and interests specifically granted in this Plan (THIS RESTATES THE REMOVAL OF THE EXISTING MORTGAGE NOTE FROM ALL THE PROPERTIES) (7)

---

(4) 11 USC § 502 (b) (9)
(5) In re Northern New England Telephone Operations LLC, 795 F.3d 343, 345 (2d Cir. 2015).
(6) Cause number 08-45761-RFN Page 14
(7) Cause number 08-45761-RFN Page 18

C. 13.4 Any distribution pursuant to this Plan which remains unclaimed for a period of six (6) months from the due date of such distribution is forfeited. (THIS MEANS THAT IF THE NEW MORGTAGE NOTE IS NOT WRITTEN WITHIN SIX MONTHS AND NO PAYMENT ACCEPTED THEN THERE WILL BE NO MORTGAGE NOTE ON THE PROPERTY) (8)

D. 14.1 To direct any necessary party to execute or deliver or to join in the execution in the execution or delivery of any instrument required to effect a Transfer of property dealt with by the Plan and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of this plan. (9)

E. (THE OLD NOTE'S ARE INVALIDE, IF THERE IS NO REPLACEMENT NOTE THEN THE PROPERTY GOES TO THE DEBTOR. THESE CHANGES AND AGREEMENTS WERE MADE BY THE MORTGAGE COMPANIES AND ACCEPTED BY ALL CREDITORS. THESE WERE NOT IMPOSED ON THE PROPERTY BY THE COURT WITHOUT THE CONSENT OF THE MORTGAGE COMPANIES)

15. "The provisions of a confirmed plan bind the debtor and each creditor. (10)" Thus, "a confirmation order is res judicata as to all issues decided or which could have been decided at the hearing on confirmation."(11) Pursuant to the doctrine of res judicata: when a final judgment has been entered on the merits of a case, "it is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." (12)

---

(8) Cause number 08-45761-RFN Page 18

(9) Cause number 08-45761-RFN Page 18

(10) 11 U.S.C. § 1327(a).

(11) In re Szostek, 886 F.2d 1405, 1408 (3d Cir. 1989); See In re Layo, 460 F.3d 289, 294 (2d Cir. 2006) (concluding that a chapter 13 confirmation order constitutes a final judgment on the merits); Carvalho v. Fed. Nat'l Mortgage Assoc. (In re Carvahlo), 335 F.3d 45, 49 (1st Cir. 2003)

(12) Arizona v. California, 530 U.S. 392, 424-5 (2000) (quoting Nevada v. United States, 463 U.S. 110, 129-130 (1983)). The confirmation of a plan and a debtor's challenge to a mortgage both address the issue of whether the underlying lien was valid. See In re Layo, 460 F.3d 289, 294 (2d Cir. 2006); In re Fennell, 2012 WL 1536535 at *4 (Bankr. E.D.N.Y. May 2, 2012).

## V. STATUTE OF LIMITATION

16. Chief District Federal Judge Lynn o the Northern District of Texas ruled in Case 3:11-cv-02592-M -BK Document 7 Filed 02/07/12 that " By its very language, Texas's four-year residual limitations clause is inapplicable to suits such as this one for the "recovery of real property." (13). Under Texas law, the "test of whether an action is one to recover real estate . . . is whether the title asserted by the plaintiff, whether legal or equitable, will support an action in trespass to try title. In determining this question, mere form in which the action is brought is immaterial." (14) Moreover, while the statute of limitations for a voidable lien is four-years, "the rule is well established in Texas that where a deed is absolutely void, a suit in law in trespass to try title may be maintained to recover the land." (15). Accordingly, when a deed is invalid and void, a plaintiff's cause of action is not barred by the four-year statute of limitation. (16) In this case, taking Plaintiff's allegations as true, as the Court must, the lien in question was void from its inception. Accordingly, this suit is not barred by limitations.

17. In any event, due to tolling, the statute of limitations is still in effect

## VI EVIDENCE SUBMITTED

18. In support of this motion, Plaintiff submits the following evidence as exhibits:

A. Page from 2008 Bankruptcy petition regarding 1713 Enchanted Ln.
B. Page from 2008 Bankruptcy petition regarding time limit to give Note
C. The 2008 Bankruptcy petition 08--45761-RFN
D. The invalid Mortgage Note
E. The invalid Deed of Trust
F. Constable's Return, Citation, Officer's Return.

## VII DEFENDANTS HAVE DEFAULTED

19. Plaintiff is William Paul Burch, who brings this suit individually and on behalf of his spouse, Juanita Burch.

20. On February 14, 2019 Plaintiff sued Defendant in Dallas County Court Number 3. On that day Plaintiff filed his ORIGINAL PETITION FOR QUIET TITLE in Dallas County Court No. 3.

---

(13) TEX.CIV.PRAC. & REM.CODE ANN. § 16.051
(14) Hardeman v. Mitchell, 44 S.W.2d 651, 654 (Tex.Civ.App. 1969).
(15) See id. (citing Slaughter v. Quails , 162 S.W.2d 671, 674 (Tex. 1942))
(16) Campsey v. Jack County Oil and Gass Ass'n, 328 S.W.2d 912, 915 (Tex.Civ.App 1959).

21. On February 18, 209 Dallas County Constable served the Citation on February 18, 2019 on Defendants registered agent, CT CORPORATION SYSTEM.

22. The Answer must be filed or before 10:00 a.m. Monday following twenty days after receiving the Citation (March11, 2019).

23. Further, Defendants are neither minors, incompetent persons, nor in the military service. Therefore, Plaintiff requests the Court or its clerk to enter default.

## VIII. CONCLUSION

24. For these reasons, Plaintiff asks the Court to grant this motion and render a judgment against Defendant JP Morgan Bank, N.A, and shall inure to their successors or assignees, in whole or in part. PLAINTIFF'S MOTION FOR ENTRY OF DEFAULT AND FOR DEFAULT JUDGMENT require Defendant to pay for expenses to repair the property of $5,600 payable to Plaintiff within 30 days and approved the attached proposed notice to the Dallas County Clerk to remove the Mortgage Lien from the property.

---

Dated: March 15, 2019

Respectfully submitted,

/S/William Paul Burch
William Paul Burch-Pro Se
P. O. Box 201236
Arlington, Texas 76006
817-919-4853
billburch@worldcrestauctions.com

EXHIBIT A

5.7 Class 6 Claimant (Allowed Secured Claims of Aurora Loan Services) is impaired and shall be satisfied as follows: Aurora Loan Services ("Aurora") is a mortgage holder on property located at 213 Woodhaven, De Soto, Texas (the "Aurora Property"). The Debtor shall surrender the Woodhaven Property in full satisfaction of the debt pursuant to 11 U.S.C. 1129(b)(2)(A)(iii). Aurora is also the lienholder on the Debtors present home at 5947 Waterford, Grand Prairie, Texas (the "Waterford Property"). The Debtors shall retain the Waterford Property as their homestead and continue to make monthly payments in accordance with the terms of the existing loan documents. The Debtor's shall pay any pre-petition arrearage on the property prior to the Effective Date. The payments to Aurora shall be principal and interest only on the Waterford property. The Debtors shall be responsible for maintaining and directly paying for adequate continuous insurance coverage on the Waterford property and directly paying all property taxes. Class 6 is impaired under this Plan.

5.8 Class 7 Claimant (Allowed Secured Claims of Chase) is impaired and shall be satisfied as follows: Chase Bank ("Chase") is the mortgage holder on the following properties located at 1713 Enchanted, Lancaster, Texas, 203 Hemlock, Arlington, Texas, 4717 Ira, Haltom City, Texas and 2236 Shady Grove, Bedford, Texas (the "Chase Properties"). Based upon the Debtors' current value of the Enchanted property, the Debtors will enter into a New Enchanted Note in the original principal amount of $68,000 ("New Enchanted Note"). The New Enchanted Note shall bear interest at the rate of 5% per annum. The Debtors shall pay the New Enchanted Note in 360 equal monthly payments of $365.04 commencing on the Effective Date. Based upon the Debtors' current value of the Hemlock property, the Debtors will enter into a New Hemlock Note in the original principal amount of $84,950 ("New Hemlock Note"). The New Hemlock Note shall bear interest at the rate of 5.25% per annum . The Debtors shall pay the New Hemlock Note in 360 equal monthly payments of $469.65 commencing on the Effective Date. Based upon the Debtors' current value of the Ira property, the Debtors will enter into a New Ira Note in the original principal amount of $78,000 ("New Ira Note"). The New Ira Note shall bear interest at the rate of 4.5% per annum . The Debtors shall pay the New Ira Note in 360 equal monthly payments of $365.63 commencing on the Effective Date. Based upon the Debtors' current value of the Shady Grove property, the Debtors will enter into a New Shady Grove Note in the original principal amount of $101,000 ("New Shady Grove Note"). The New Shady Grove Note shall bear interest at the rate of 4.5% per annum . The Debtors shall pay the New Shady Grove Note in 360 equal monthly payments of $512.56 commencing on the Effective Date. Class 7 is impaired under this Plan.

5.9 Class 8 Claimant (Allowed Secured Claims of Countrywide Home Loans) is impaired and shall be satisfied as follows: Countrywide Home Loans ("Countrywide") is the mortgage holder on the properties located at 1053 Briarwood, De Soto, Texas, 2811 Galemeadow, Fort Worth, Texas and 7613 Timberline, Kennedale, Texas (the "Countrywide Properties"). The Debtors shall retain the Countrywide Properties. Based upon the Debtors' current value of the Brairwood property, the Debtors will enter into a New Briarwood Note in the original principal amount of $82,000 ("New Brairwood Note"). The New Briarwood Note shall bear interest at the rate of 5% per annum . The Debtors shall pay the New Briarwood Note in 360 equal monthly payments of $413.35 commencing on the Effective Date. Based upon the Debtors' current value of the Galemeadow property, the Debtors will enter into a New Galemeadow Note in the original principal amount of $61,600 ("New Galemeadow Note"). The New Galemeadow Note shall bear interest at the rate of 4.5% per annum.

EXHIBIT B

In the event the case is converted to a proceeding under Chapter 7, all property of the estate will vest in the Chapter 7 trustee.

12.3 All property of the Reorganized Debtors is free and clear of all Claims and interests of Creditors and Equity Interest Holders, except as to claims, secured claims or secured debentures and interests specifically granted in this Plan.

12.4 All Debts that arose before the Confirmation Date and any Debt of a kind specified in Section 502(g), 502(h) or 502(i) of the Code, whether or not a proof of claim based on such Debt is filed or deemed filed under Section 501, whether or not such Claim is allowed under Section 502; and whether or not the holder of such Claim has accepted this Plan; are, fully and finally satisfied by this Plan.

## ARTICLE 13
## MISCELLANEOUS PROVISIONS

13.1 The obligations under this Plan to any particular Claim are governed by the laws of the State constituting the situs of the debt represented by that particular Claim described in this Plan.

13.2 Equity Interest Holders are relieved from all liability, obligation or duty to initiate or pursue any causes of action of Debtors against any Entity.

13.3 Any caption herein is for convenience only and does not affect the construction of the Plan.

13.4 Any distribution pursuant to this Plan which remains unclaimed for a period of six (6) months from the due date of such distribution is forfeited.

## ARTICLE 14
## RETENTION OF JURISDICTION

Until this case is closed, the Court retains jurisdiction of the following matters only:

14.1 To direct any necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a Transfer of property dealt with by the Plan and to perform any other act, including the satisfaction of any Lien, that is necessary for the consummation of this Plan.

14.2 To allow or disallow Claims.

EXHIBIT C

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 9, 2009**

**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| WILLIAM & JUANITA BURCH | § | CASE 08-45761-RFN-11 |
| | § | |
| DEBTOR | § | |

**ORDER CONFIRMING DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION**

CAME ON FOR CONSIDERATION by the Court at the confirmation hearing held on December 8, 2009, the Debtor's Third Amended Plan of Reorganization filed October 16, 2009 ("Plan") as described by that certain Amended Disclosure Statement dated May 27, 2009, filed by William & Juanita Burch, Debtors in the above-styled and numbered case. The Plan having been transmitted to all creditors, equity interest holders and parties-in-interest and the Court having reviewed the Plan and the Court having been informed that no Objections to Confirmation have been

filed which have not been resolved by the modification announced in open Court on December 8, 2009,, and after hearing the evidence presented, testimony of witnesses, and argument of counsel, concludes as follows:

1. The majority of all creditors in all classes and the equity holders voting have voted to accept the Plan.

2. The Plan complies with the applicable provisions of Title 11, and the Debtor, as the plan proponent, has complied with the applicable provisions of Title 11.

3. The Plan has been proposed in good faith and not by any means forbidden by law.

4. The requisite number of impaired classes of claims or interests voting have voted to accept the Plan.

5. All payments made or promised to be made by the Debtor or any other person for services or for costs and expenses in, or in connection with, the Plan, and incident to the case, have been disclosed to the Court and are reasonable or, if to be fixed after Confirmation of the Plan, will be subject to the approval of the Court.

6. The identity, qualifications, and affiliations of the persons who are to serve the Debtor, after Confirmation of the Plan, have been fully disclosed, and the appointment of such persons to such offices, or their continuance therein, is equitable, and consistent with the interests of the creditors and equity security holders and with public policy.

7. The identity of any insider that will be employed or retained by the Debtor and his compensation has been fully disclosed.

8. The Plan does not affect any rate change of any regulatory commission with jurisdiction over the rights of the Debtor.

9. The Plan is not likely to be followed by further need for reorganization.

filed which have not been resolved by the modification announced in open Court on December 8, 2009,, and after hearing the evidence presented, testimony of witnesses, and argument of counsel, concludes as follows:

1. The majority of all creditors in all classes and the equity holders voting have voted to accept the Plan.

2. The Plan complies with the applicable provisions of Title 11, and the Debtor, as the plan proponent, has complied with the applicable provisions of Title 11.

3. The Plan has been proposed in good faith and not by any means forbidden by law.

4. The requisite number of impaired classes of claims or interests voting have voted to accept the Plan.

5. All payments made or promised to be made by the Debtor or any other person for services or for costs and expenses in, or in connection with, the Plan, and incident to the case, have been disclosed to the Court and are reasonable or, if to be fixed after Confirmation of the Plan, will be subject to the approval of the Court.

6. The identity, qualifications, and affiliations of the persons who are to serve the Debtor, after Confirmation of the Plan, have been fully disclosed, and the appointment of such persons to such offices, or their continuance therein, is equitable, and consistent with the interests of the creditors and equity security holders and with public policy.

7. The identity of any insider that will be employed or retained by the Debtor and his compensation has been fully disclosed.

8. The Plan does not affect any rate change of any regulatory commission with jurisdiction over the rights of the Debtor.

9. The Plan is not likely to be followed by further need for reorganization.

10. All Section 1930 fees shall be paid by the Debtor on or before the Effective Date of the Plan or as agreed to by the Debtor and the United States Trustee.

11. All creditors will receive more under the Plan than they would receive in a Chapter 7 liquidation.

12. The Plan does not affect any retiree benefits.

13. The Modifications announced in open Court on December 8, 2009 do not adversely affect any creditor who has previously voted to accept the Plan.

14. The Debtor reserves the right to object to the amount and allowance of all claims after Confirmation. All such objections shall be filed within sixty (60) days of the Effective Date, as defined in the Plan.

It is accordingly,

ORDERED, ADJUDGED AND DECREED that the Modifications announced in open Court on December 8, 2009, are approved. It is further

ORDERED ADJUDGED AND DECREED that the Debtor's Fourth Amended Plan of Reorganization, as attached hereto as Exhibit "A", is confirmed. It is further

ORDERED, ADJUDGED AND DECREED the Debtor is hereby required to file quarterly operating reports with the United States Trustee until such time as the case in closed. The Debtor is further required to pay the United States Trustee quarterly fees until such time as the clerk of the court closes the case.

Exhibit "A

Eric A. Liepins
ERIC A. LIEPINS, P.C.
12770 Coit Road
Suite 1100
Dallas, Texas 75251
Ph. (972) 991-5591
Fax (972) 991-5788

ATTORNEY FOR DEBTOR

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| WILLIAM & JUANITA BURCH | § | |
| | § | Case No. 08-No. 08-45761-11 |
| DEBTORS | § | |

**FOURTH AMENDED PLAN OF REORGANIZATION OF WILLIAM & JUANITA BURCH PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE DATED OCTOBER 16, 2009**

**TO: ALL PARTIES-IN-INTEREST, THEIR ATTORNEYS OF RECORD AND TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

COME NOW, William & Juanita Burch, Debtors and Debtors-in-Possession in the above-referenced bankruptcy cases, and proposes the following Plan of Reorganization ("Plan"). The Plan proposes segregation of the Creditors of the Debtor into 14 separate classes.

## ARTICLE I

**DEFINITIONS**

Unless the context otherwise requires, the following capitalized terms shall have the meanings indicated when used in this Plan and in the accompanying Disclosure Statement, which meaning shall be equally applicable to both the singular and plural forms of such terms. Any term in this Plan that is not defined herein but that is used in title 11, United States Code ("Code") shall have the meaning assigned to such term in the Code.

1. **"Administrative Claim"** shall mean those Claims entitled to priority under the provisions of Section 507 of the Code, pursuant to a claimed and allowed administrative expense priority under Section 503(b) of the Code. However ad valorem tax authorities shall not be required to file and Administrative Expenses claim and request for payment in order for their Administrative Expenses Claims to be allowed.

2. **"Allowed Claim"** as to all Classes, hereinafter specified, shall mean a Claim against Debtor (a) for which a Proof of Claim has been timely filed with the Court by the Bar Date, or, with leave of the Court and without objection by any party-in-interest, late-filed and as to which neither the Debtor nor any party-in-interest files an objection or as to which the Claim is allowed by Final Order of the Court, or (b) scheduled in the list of creditors, as may be amended, prepared and filed with the Court pursuant to Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, as to which no objection to the allowance thereof has been interposed through closing of this case, or as to which any such objection has been determined by an order or judgment which is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending. This category includes all Claims deemed unsecured pursuant to §506(a) of the Code. When "Allowed Claim" is used in the context of a Secured Claim, the provisions of §506(b) of the Code shall also apply.

3. **"Allowed Secured Claim"** shall mean an Allowed Claim secured by a lien, security interest, or other encumbrance on the properties owned by the Debtor, which lien, security interest, or other encumbrance has been properly perfected as required by law, to the extent of the value of the property encumbered thereby. That portion of such Claim exceeding the value of the security held therefor shall be an Unsecured Claim, as defined below and determined pursuant to 11 U.S.C. §506(a).

4. **"Allowed Unsecured Claim"** shall mean an unsecured Claim against Debtor (a) for which a Proof of Claim has been timely filed with the Court by the Bar Date, or, with leave of the Court and without objection by any party-in-interest, late-filed and as to which neither the Debtor nor any party-in-interest files an objection or as to which the Claim is allowed by Final Order of the Court, or (b) scheduled in the list of creditors, as may be amended, prepared and filed with the Court pursuant to Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, as to which no objection to the allowance thereof has been interposed through closing of this case, or as to which any such objection has been determined by an order or judgment which is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending. This category includes all Claims deemed unsecured pursuant to §506(a) of the Code.

5. **"Bar Date"** shall mean the date fixed by the Court as the last date for filing all Claims in this case other than Administrative and Priority Claims or Rejection Claims.

6. **"Case"** shall mean this Chapter 11 case.

7. **"Claim"** shall mean any right to payment from the Debtor as of the date of entry of the Order Confirming Plan whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or can be asserted by way of set-off. Claim includes any right or cause of action based on a pre-petition monetary or non-monetary default.

8. **"Claimant"** shall mean the holder of a Claim.

9. **"Class"** shall refer to a category of holders of Claims or interests which are "substantially similar" as provided for in Section 1122 of the Code.

10. **"Code"** shall mean the United States Bankruptcy Code, being title 11 of the United States Code, as enacted in 1978 and thereafter amended.

11. **"Confirmation"** or **"Confirmation of this Plan"** shall mean entry by the Court of an Order confirming this Plan at or after a hearing pursuant to Section 1129 of the Code.

12. **"Confirmation Date"** shall mean the date on which the Court enters an Order confirming this Plan.

13. **"Court"** shall mean the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, presiding over this Chapter 11 reorganization case, or any successor court of competent jurisdiction.

14. **"Creditor"** shall mean any person having a Claim against Debtor.

15. **"Debt"** shall mean any obligation of Debtor, alone, and any obligation of Debtor and any other Person, to any Entity.

16. **"Debtor"** or **"Debtors"** shall mean William and Juanita Burch, individually and the Debtors in the above-styled and numbered case.

17. **"Disbursing Agent"** shall mean the Reorganized Debtor.

18. **"Effective Date"** shall mean thirty days after the Final Confirmation Date.

19. **"Entity"** shall include Person, estate trust, governmental unit and the United States Trustee.

20. **"Equity Interest Holders"** shall mean holders of the equity interests in the Debtors.

21. **"Final Confirmation"** shall mean that date which is eleven (11) days following the entry of the Order Confirming Plan, during which period of time no Notice of Appeal is filed, or if

a Notice of Appeal is filed, during which period of time no Motion for Stay Pending Appeal is granted or supersedeas bond is approved and filed.

22. **"Order Confirming Plan"** shall mean the Order of the Court determining that this Plan meets the requirements of Chapter 11 of the Code and is entitled to confirmation or filed for relief under Chapter 11 of the Code.

23. **"Petition Date"** shall mean the date on which the Debtor filed this proceeding, December 1, 2008.

24. **"Plan"** shall mean this Plan of Reorganization in its present form or as it may be amended, modified or supplemented.

25. **"Priority Claim"** shall mean any Claim entitled to priority pursuant to Section 507(a) of the Code except for Tax Claims and Claims incurred by the Debtor post-petition in the ordinary course of business.

26. **"Rejection Claim"** shall mean any Claim arising out of the rejection of a lease or executory contract pursuant to Section 365 of the Code, which Claim shall be treated as an Unsecured Claim.

27. **"Reorganized Debtor"** shall mean the entity which shall assume title to and control of the Debtors' assets and liabilities upon confirmation as provided herein.

28. **"Secured Claim"** shall mean an Allowed Claim secured by a lien, security interest, or other encumbrance on the properties owned by the Debtor, which lien, security interest, or other encumbrance has been properly perfected as required by law, to the extent of the value of the property encumbered thereby. That portion of such Claim exceeding the value of the security held therefor shall be an Unsecured Claim, as defined below and determined pursuant to 11 U.S.C. §506(a).

29. **"Substantial Consummation"** shall occur upon Debtor's commencement of payments to creditors as provided in this Plan.

30. **"Tax Claims"** shall mean any Claim entitled to priority under Section 507(a)(8) of the Code and shall include the claims of taxing authorities for taxes owed on the property retained by the Debtor under this Plan.

31. **"Unsecured Claim"** shall mean any Allowed Claim, whether or not liquidated or contingent other than a Priority Claim, a Tax Claim, or a Secured Claim.

## ARTICLE 2
## CERTAIN GENERAL TERMS AND CONDITIONS

The following general terms and conditions apply to this Plan:

2.1 **Claims and Debts**: Various types of Claims and Debts are defined in this Plan. This Plan is intended to deal with all Claims and Debts against the Debtors of whatever character whether or not contingent or liquidated and whether or not allowed by the Court pursuant to Section 502(a) of the Code and all Claims and Debts will receive the treatment afforded in Articles of this Plan. Claims and Debts incurred by the Debtors post-petition, including ad valorem taxes, in the ordinary course of business will be paid by the Debtors according to their terms as they come due.

2.2 **Securities Laws**: The issuance of any security in satisfaction of indebtedness under this Plan may be exempt from registration under certain State and Federal securities laws by virtue of Section 1145 of the Code and the exemption therein contained.

2.3 **Time for Filing Claims**: With respect to those Claims that have been identified in the Schedules filed pursuant to Section 521(1) of the Code and which have been scheduled as "disputed," "contingent," or "unliquidated," said Claimants must file a proof of claim bearing the case number of the above-styled and referenced proceeding with the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, on or before the Bar Date to participate under this Plan. Claims scheduled as disputed, contingent, or unliquidated filed after the Bar Date shall not be allowed, and shall not participate in the distributions contemplated by this Plan. Claims arising from rejection of a lease or executory contract and administrative claims shall be filed with the Court within thirty (30) days following the Confirmation Date of this Plan.

2.4 **Modifications to Plan**: In accordance with Bankruptcy Rule 3019, to the extent applicable, this Plan may be modified upon application of Debtors or corrected prior to Confirmation without notice and hearing and without additional disclosure pursuant to Section 1125 of the Code provided that, after hearing on and notice to the creditors, the Court finds that such modification does not materially or adversely affect any Creditor or Class of Creditor.

## ARTICLE 3
## TREATMENT OF UNCLASSIFIED CLAIMS
## (CERTAIN ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS)

3.1 All trade and service debts and obligations, including ad valorem taxes for year 2009, incurred in the normal course of business by the Debtors on or after the Petition Date will be paid when due in the ordinary course of the Debtors' business unless a different time for payment is specified in this Plan.

3.2 Each governmental unit holding a post-petition Claim arising out of taxes assessed against property of the estate, also including "ad valorem property taxes," but limited as provided by Section 502(b)(3) of the Code, shall be paid in full when said Claims are due.

## ARTICLE 4
## DIVISION OF CREDITORS INTO CLASSES

4.1 Classification of Claims: This Classification of Claims is made for purposes of voting on this Plan, making distributions thereunder, and for ease of administration thereof. Unless specifically provided otherwise herein, on the Confirmation Date this Plan discharges and extinguishes all Claims and Debts against the Debtor of whatever character, whether allowed by the Court or otherwise.

| | |
|---|---|
| Class 1: | Consists of **Allowed Administrative Claims Attorney fees and US Trustee Fees** (Not Impaired) |
| Class 2: | Consists of **Allowed IRS Tax Claims** (Impaired) |
| Class 3: | Consists of **Allowed Ad Valorem Tax Claims** (Impaired) |
| Class 4: | Consists of **Allowed Secured Claim of America Home Mortgage Bank** (Impaired) |
| Class 5: | Consists of **Allowed Secured Claim of America's Servicing Company** (Impaired) |
| Class 6: | Consists of **Allowed Secured Claim of Aurora Loan Service** (Impaired) |
| Class 7: | Consists of **Allowed Secured Claim of Chase Bank** (Impaired) |
| Class 8: | Consists of **Allowed Secured Claim of Countrywide Home Loans** (Impaired) |
| Class 9: | Consists of **Allowed Secured Claim of Freedom Mortgage** (Impaired) |
| Class 10: | Consists of **Allowed Secured Claim of Litton Loan Servicing** (Impaired) |
| Class 11: | Consists of **Allowed Secured Claim of Select Portfolio Services** (Impaired) |
| Class 12: | Consists of **Allowed Secured Claim of Sprint Partners** (Impaired) |
| Class 13: | Consists of **Allowed Secured Claim of Wells Fargo** (Impaired) |
| Class 14: | Consists of **Allowed Unsecured Creditors** (Impaired) |

## ARTICLE 5
## TREATMENT OF CLASSES

5.1 **Satisfaction of Claims and Debts**: The treatment of and consideration to be received by holders of Allowed Claims or interests pursuant to this Article of this Plan shall be in full settlement, release and discharge of their respective Claims, Debts, or interests as against the Debtors subject to the provisions herein. On the Confirmation Date, the Reorganized Debtor shall assume all duties, responsibilities and obligations for the implementation of this Plan.

5.2 Class 1 Claimants (Allowed Administrative Claims of Professionals and US Trustee)

are unimpaired and will be paid in cash and in full on the Effective Date of this Plan. Professional fees are subject to approval by the Court as reasonable. Debtors' attorney's fees approved by the Court and payable to the law firm of Eric Liepins, P.C. will be paid immediately following the later of Confirmation or approval by the Court out of the available cash. This case will not be closed until all allowed Administrative Claims are paid in full. Aurora Loan Services shall have an Administrative Claim in the amount of $1,500. This Claim shall be paid in twelve monthly installments commencing on the Effective Date. Class 1 Creditor Allowed Claims are estimated as of the date of the filing of this Plan to not exceed the amount of $15,000 including Section 1930 fees. Section 1930 fees shall be paid in full prior to the Effective Date. The Debtors are required to continue to make quarterly payments to the U.S. Trustee and may be required to file post-confirmation operating reports until this case is closed. The Class 1 Claimants are not impaired under this Plan.

5.3 5.3 Class 2 Claimants (Allowed Secured Claim of IRS) is impaired and shall be satisfied as follows: The Allowed Secured Claim of the IRS shall will be satisfied by being paid in full with interest in monthly installments, out of revenue of the Reorganized Debtor's continued operation of business, with the total amount of that Allowed Secured Claim subject to being reduced during the term of the Plan through lump sum payments from distribution of proceeds in accordance with existing lien priorities from the sale of any real property assets of the Debtor. (a) This Class consists of the Allowed Secured Claim of the United States of America, Internal Revenue Service ("IRS"). That Claim is in the amount of $116,584.13 as evidenced by the Proof of Claim filed herein by the IRS, being Claim 18-2, and is secured by liens on the real and personal property of the Debtors as identified in the attachments to the Proof of Claim. The Plan intends to treat the IRS claim as a secured Class 2 claim. The Class 2 claim will be paid in full over a 60 month period from the date of the petition, commencing on the Effective Date with interest at a rate of 4% per annum. The amount of the Class 2 Allowed Secured Claim of the IRS may be amended should the IRS file an amended proof of claim in this case. The IRS may file an amendment to its Proof of Claim at any time and said amendment will be deemed timely filed.

(b) The Class 2 Allowed Secured Claim of the IRS will be paid, together with interest at the rate of 4% per annum, in cash in equal monthly payments of $2,489.57 each over a term not to exceed 51 months from the date of Confirmation, with the first payment to be due on the first day of the first month following the Effective Date, and with the subsequent payments being due on the first day of each month thereafter. The amount of the monthly payment may change in the event the Debtor's objects to the IRS Proof of Claim or in the event the IRS amends its Proof of Claim. The Debtor has filed amended returns to reflect changes in the amount owed.

(c) The Class 2 Claimant, the IRS, will, notwithstanding any other term or provision of this Plan, retain its liens until the Allowed Secured Claim is, together with interest, paid in full. However, as set forth in the Plan in the event the Debtor sell any of the Properties, the IRS shall release its lien on the Property sold once all proceeds from the sale are distributed in accordance with existing lien priorities.

(d) The IRS Secured Claim of $116,584.13 is an Allowed Secured Claim unless the Debtor or Reorganized Debtor files an objection to the filed IRS Proof of Claim before the expiration of 30 days from the Effective Date. If such an objection is timely filed, then the IRS Secured Claim will become an Allowed Secured Claim upon final order of the Court resolving that objection and the amount of the IRS Secured Claim. If the IRS files an amended proof of claim changing the amount of the Secured Claim, then the amount of the amended proof of claim will become the Class 2

Allowed Secured Claim of the IRS unless an objection is filed thereto within 30 days of the filing of the amended proof of claim.

(e) Payments under the Plan to the IRS on its claims are to be made to: Internal Revenue Service, Insolvency, Attn: Nathan Villanueva, Bankruptcy Advisor, Insolvency Group 1, Room 937, MAIL Code 5029, 1100 Commerce Street, Dallas, Texas 75242, 214.413.5346, Facsimile 214.413.5208.

(f) Notwithstanding any other provision or term of this Plan or order of confirmation, the following Default Provision shall apply to the IRS and its claims and administrative expense claims in this case:

If the Debtor or the Reorganized Debtor fails to make all payments on federal taxes, claims of the IRS, and administrative expense claims of the IRS, which are provided for in this Plan or order of confirmation, or if any other event of default as provided in the Plan occurs, the IRS shall be entitled to give the Debtor and Reorganized Debtor notice of the default and if the default has not been cured within thirty (30) days from the mailing of the written notice, the IRS shall have the following rights and the following provisions shall apply to the IRS:

(1) The IRS shall have the right to declare due and payable any interest or penalties which would have accrued on pre-petition tax liabilities of the Debtor but for the filing of the bankruptcy petition and if the Debtor fails to pay the interest and penalties then they may be assessed by the IRS;

(2) The pre-petition tax claims shall be treated as taxes owed by a non-debtor as if no bankruptcy petition has been filed and as if no plan had been confirmed;

(3) The IRS shall have the right to proceed to collect from the Debtor or the reorganized Debtor any of the pre-petition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed, and, such procedure shall include, but not be limited to:

(i) the filing of notices of federal tax liens; and (ii) collection by levy as provided by I.R.C. §§ 6331 through 6344; and

(4) The failure of the IRS to declare a default does not constitute a waiver by the IRS of the right to declare that the Debtor or Reorganized Debtor are in default of the Plan or order of confirmation.

5.4 <u>Class 3 Claimants (The Allowed Property Taxes Claims)</u>. The Allowed Amount of all Priority Property Tax Creditor Claims shall be paid out of either the proceeds from the sale of any property for which a tax is owed or out of the revenues or employment income of the Debtor for any property which is to be retained under the Plan. The Priority Tax Creditor Claims which are to be paid under the Plan result from real property taxes on the following properties: 3007 Sunnybrook, Arlington, Texas, 2811 Galemeadow, Fort Worth, Texas and 511 Plainview, Mansfield, Texas (The "Tax Properties"). Various taxing authorities have filed Proofs of Claim, however, those Proofs of Claim include taxes which have now been paid. The Debtors believe the current amount of past due ad valorem taxes is $18,645. The Monthly payment on these taxes will be approximately $414 per month. The amounts owning on the Tax Properties are the ad valorem real property taxes for tax years 2007 and 2008. These taxes will be paid over a 60 month period commencing on the Effective Date. The Ad Valorem Taxes for real property taxes will receive post-petition pre-confirmation

interest at the state statutory rate of 1% per month and post-confirmation interest at the rate of 12% per annum. The ad valorem Taxing Authorities shall retain their liens, and their lien priority, to secure their Tax Claims until paid in full as called for by this Plan.

5.5 C lass 4 Claimant (Allowed Secured Claim of America Home Mortgage) is impaired and shall be satisfied as follows: America Home Mortgage ("America") is the mortgage holder on the properties located at 426 Falling Leaves, Duncanville, Texas, 420 Georgetown, Everman, Texas and 3007 Sunnybrook, Arlington, Texas (the "America Properties"). The Debtor shall surrender the Falling Leaves property in full satisfaction of the debt pursuant to 11 U.S.C. 1129(b)(2)(A)(iii). Based upon the Debtors' current value of the Georgetown property, the Debtors will enter into a New Georgetown Note in the original principal amount of $59,500 ("New Georgetown Note"). The New Georgetown Note shall bear interest at the rate of 4.5% per annum . The Debtors shall pay the New Georgetown Note in 360 equal monthly payments of $302.29 commencing on the Effective Date. Based upon the Debtors' current value of the Sunnybrook property, the Debtors will enter into a New Sunnybrook Note in the original principal amount of $81,432 ("New Sunnybrook Note"). The New Sunnybrook Note shall bear interest at the rate of 7% per annum . The Debtors shall pay the New Sunnybrook Note in 360 equal monthly payments of $542 commencing on the Effective Date. Class 4 is impaired under this Plan.

5 Class 5 Claimant (Allowed Secured Claim of America's Servicing Company) is impaired and shall be satisfied as follows: America's Servicing Company ("Servicing") is the mortgage holder on the properties located at 1937 Bolingbroke, Fort Worth, Texas, 503 W. 8th Street, Lancaster, Texas, 2809 Harvest Lake Irving, Texas, and 707 Hunters Glen, Arlington, Texas (the "Servicing Properties"). The Debtors shall retain the Servicing Properties. Based upon the Debtors' current value of the Bolingbroke property, the Debtors will enter into a New Bolingbroke Note in the original principal amount of $75,000 ("New Bolingbroke Note"). The Bolingbroke Note shall bear interest at the rate of 4.5% per annum . The Debtors shall pay the New Bolingbroke Note in 360 equal monthly payments of $380 commencing on the Effective Date. Based upon the Debtors' current value of the 8th Street property, the Debtors will enter into a New 8th Street Note in the original principal amount of $34,800 ("New 8th Street Note"). The New 8th Street Note shall bear interest at the rate of 4.5% per annum . The Debtors shall pay the New 8th Street Note in 360 equal monthly payments of $173.09 commencing on the Effective Date. Based upon the Debtors' current value of the Harvest Lake property, the Debtors will enter into a New Harvest Lake Note in the original principal amount of $89,620 ("New Harvest Lake Note"). The New Harvest Lake Note shall bear interest at the rate of 4.5% per annum . The Debtors shall pay the New Harvest Lake Note in 360 equal monthly payments of $454 commencing on the Effective Date. Based upon the Debtors' current value of the Hunters Glen property, the Debtors will enter into a New Hunters Glen Note in the original principal amount of $75,000 ("New Hunters Glen Note"). The New Hunters Glen Note shall bear interest at the rate of 4.5% per annum . The Debtors shall pay the New Hunters Glen Note in 360 equal monthly payments of $380.83 commencing on the Effective Date. Class 5 is impaired under this Plan.

5.7 Class 6 Claimant (Allowed Secured Claims of Aurora Loan Services) is impaired and shall be satisfied as follows: Aurora Loan Services ("Aurora") is a mortgage holder on property located at 213 Woodhaven, De Soto, Texas (the "Aurora Property"). The Debtor shall surrender the Woodhaven Property in full satisfaction of the debt pursuant to 11 U.S.C. 1129(b)(2)(A)(iii). Aurora is also the lienholder on the Debtors present home at 5947 Waterford, Grand Prairie, Texas (the "Waterford Property"). The Debtors shall retain the Waterford Property as their homestead and continue to make monthly payments in accordance with the terms of the existing loan documents. The Debtor's shall pay any pre-petition arrearage on the property prior to the Effective Date. The payments to Aurora shall be principal and interest only on the Waterford property. The Debtors shall be responsible for maintaining and directly paying for adequate continuous insurance coverage on the Waterford property and directly paying all property taxes. Class 6 is impaired under this Plan.

5.8 Class 7 Claimant (Allowed Secured Claims of Chase) is impaired and shall be satisfied as follows: Chase Bank ("Chase") is the mortgage holder on the following properties located at 1713 Enchanted, Lancaster, Texas, 203 Hemlock, Arlington, Texas, 4717 Ira, Haltom City, Texas and 2236 Shady Grove, Bedford, Texas (the "Chase Properties"). Based upon the Debtors' current value of the Enchanted property, the Debtors will enter into a New Enchanted Note in the original principal amount of $68,000 ("New Enchanted Note"). The New Enchanted Note shall bear interest at the rate of 5% per annum. The Debtors shall pay the New Enchanted Note in 360 equal monthly payments of $365.04 commencing on the Effective Date. Based upon the Debtors' current value of the Hemlock property, the Debtors will enter into a New Hemlock Note in the original principal amount of $84,950 ("New Hemlock Note"). The New Hemlock Note shall bear interest at the rate of 5.25% per annum . The Debtors shall pay the New Hemlock Note in 360 equal monthly payments of $469.65 commencing on the Effective Date. Based upon the Debtors' current value of the Ira property, the Debtors will enter into a New Ira Note in the original principal amount of $78,000 ("New Ira Note"). The New Ira Note shall bear interest at the rate of 4.5% per annum . The Debtors shall pay the New Ira Note in 360 equal monthly payments of $365.63 commencing on the Effective Date. Based upon the Debtors' current value of the Shady Grove property, the Debtors will enter into a New Shady Grove Note in the original principal amount of $101,000 ("New Shady Grove Note"). The New Shady Grove Note shall bear interest at the rate of 4.5% per annum . The Debtors shall pay the New Shady Grove Note in 360 equal monthly payments of $512.56 commencing on the Effective Date. Class 7 is impaired under this Plan.

5.9 Class 8 Claimant (Allowed Secured Claims of Countrywide Home Loans) is impaired and shall be satisfied as follows: Countrywide Home Loans ("Countrywide") is the mortgage holder on the properties located at 1053 Briarwood, De Soto, Texas, 2811 Galemeadow, Fort Worth, Texas and 7613 Timberline, Kennedale, Texas (the "Countrywide Properties"). The Debtors shall retain the Countrywide Properties. Based upon the Debtors' current value of the Brairwood property, the Debtors will enter into a New Briarwood Note in the original principal amount of $82,000 ("New Brairwood Note"). The New Briarwood Note shall bear interest at the rate of 5% per annum . The Debtors shall pay the New Briarwood Note in 360 equal monthly payments of $413.35 commencing on the Effective Date. Based upon the Debtors' current value of the Galemeadow property, the Debtors will enter into a New Galemeadow Note in the original principal amount of $61,600 ("New Galemeadow Note"). The New Galemeadow Note shall bear interest at the rate of 4.5% per annum.

The Debtors shall pay the New Galemeadow Note in 360 equal monthly payments of $312.93 commencing on the Effective Date. Based upon the Debtors' current value of the Timberline property, the Debtors will enter into a New Timberline Note in the original principal amount of $89,602 ("New Timberline Note"). The New Timberline Note shall bear interest at the rate of 5% per annum. The Debtors shall pay the New Timberline Note in 360 equal monthly payments of $472.40 commencing on the Effective Date. Class 8 is impaired under this Plan.

5.10 Class 9 Claimant (Allowed Secured Claims of Freedom Mortgage) is impaired and shall be satisfied as follows: Freedom Mortgage ("Freedom") is the mortgage holder on the property located at 1006 Nancy, Lancaster, Texas (the "Freedom Property").Based upon the Debtors' current value of the Nancy property, the Debtors will enter into a New Nancy Note in the original principal amount of $67,000 ("New Nancy Note"). The New Nancy Note shall bear interest at the rate of 7% per annum. The Debtors shall pay the New Nancy Note in 360 equal monthly payments of $412 commencing on the Effective Date. Class 9 is impaired under this Plan.

5.11 Class 10 Claimant (Allowed Secured Claims of Litton Loan Servicing) is impaired and shall be satisfied as follows: Litton Loan Servicing ("Litton") is the mortgage holder on the property located at 2531 Gerry Way, Lancaster, Texas (the "Litton Property"). Based upon the Debtors' current value of the Gerry Way property, the Debtors will enter into a New Gerry Way Note in the original principal amount of $33,000 ("New Gerry Way Note"). The New Gerry Note shall bear interest at the rate of 5.1% per annum. The Debtors shall pay the New Gerry Way Note in 360 equal monthly payments of $195.86 commencing on the Effective Date. Class 10 is impaired under this Plan.

5.12 Class 11 Claimant (Allowed Secured Claims of Select Portfolio Services) is impaired and shall be satisfied as follows: Select Portfolio Services ("Select") is the mortgage holder on the properties located at 1169 Meadow Creek, Lancaster, Texas and 3805 Wrentham, Arlington, Texas (the "Select Properties"). The Debtor shall surrender the Meadow Creek in full satisfaction of the debt pursuant to 11 U.S.C. 1129(b)(2)(A)(iii). Based upon the Debtors' current value of the Wrentham property, the Debtors will enter into a New Wrentham Note in the original principal amount of $113,621.64 (or such amount as determined by the Court) ("New Wrentham Note"). The New Wrentham Note shall bear interest at the rate of 7% per annum. The Debtors shall pay the New Wrentham Note in 360 equal monthly payments of $755 commencing on the Effective Date. The Class 11 Creditor is impaired under this Plan.

5.13 Class 12 Claimant (Allowed Secured Claims of Sprint Partners) is impaired and shall be satisfied as follows: Sprint Partners ("Sprint") is the mortgage holder on the property located at 511 Plainview, Mansfield, Texas (the "Plainview Property"). The Debtor shall surrender the Plainview property in full satisfaction of the indebtedness pursuant to 11 U.S.C. 1129(b)(2)(A)(iii). Class 12 is impaired under this Plan.

5.14 Class 13 Claimant (Allowed Secured Claims of Wells Fargo) is impaired and shall be satisfied as follows: Wells Fargo ("Wells") is the mortgage holder on the property located at 7188 Chambers Creek, Arlington, Texas (the "Chambers Creek Property"). Based upon the Debtors'

current value of the Chambers Creek property, the Debtors will enter into a New Chambers Creek Note in the original principal amount of $120,000 ("New Chambers Creek Note"). The New Chambers Creek Note shall bear interest at the rate of 4.5% per annum. The Debtors shall pay the New Chambers Creek Note in 360 equal monthly payments of $608.83 commencing on the Effective Date. Class 13 is impaired under this Plan.

5.15 Class 14 Claimants (Allowed Unsecured Creditors) are impaired and shall be satisfied as follows: All Allowed Unsecured Creditors, this will include any bificated secured and unsecured creditors from Classes 4 through 13, and any claims of junior lienholders on any of the Retained Properties, including the junior liens held by JPMorgan Chase on the properties located at 1937 Bolingbroke Ct, Fort Worth, Texas – claim #35; 426 Falling Leaves Dr., Duncanville, Texas – claim #36; 2809 Harvest Lake Dr., Irving, Texas – claim #32; and 707 N. Hunters Glen Circle, Arlington, Texas – claim #34, hereinafter referred to as the "JP Morgan Chase Junior Liens"), shall be paid out of the unsecured creditors pool. However, any Class 14 creditors whose claim arises as a result of the value of any of the properties being less than the amount of the lien claims on those properties, including the JPMorgan Chase Junior Liens described above, shall be entitled to retain their liens on the properties during the term of the Plan, and in the event any property is sold under the Plan to which these liens attach, the creditor holding such lien shall be entitled to assert the amount of its lien claim to the proceeds of any such sale, to the exclusion of other unsecured creditors, after payment of any priority lien claimants.

Otherwise, the Debtors shall make payments unto the unsecured creditors in the amount of $300 per month for a period of 60 months. In the event the Debtors sell any of the Retained Properties in the first 12 months from the Confirmation Date, 30% of the Net Proceeds (which shall mean monies remaining after payment of taxes, existing liens, including the IRS lien and JPMorgan Chase Junior Liens, and closing costs) will be placed into the Unsecured Creditor's Pool and distributed at the next scheduled distribution date. In the event the Debtors sell any of the Retained Properties in months 13 to 24 from the Confirmation Date, 20% of the Net Proceeds will be placed into the Unsecured Creditor's Pool and distributed at the next scheduled distribution date. In the event the Debtors sell any of the Retained Properties in months 25 to 36 from the Confirmation Date, 10% of the Net Proceeds will be placed into the Unsecured Creditor's Pool and distributed at the next scheduled distribution date. Allowed Unsecured Creditors shall receive their pro rata share of the Unsecured Class 14 Creditors Pool on a quarterly basis commencing on the last day of the first full calendar quarter after the Effective Date. The Class 14 Claimants are impaired under this Plan.

## ARTICLE 6
## MEANS FOR EXECUTION OF THE PLAN

6.1 **Action to be taken:** Any actions required to be taken by the Debtors on the Effective Date may be taken by the Debtors before the Effective Date or immediately following the date of Final Confirmation.

6.2 **Ongoing Operations:** The Debtors' obligations under this Plan will be satisfied out of the ongoing operations of the Reorganized Debtors. The income projections of the Reorganized Debtors are attached to the Disclosure Statement. The Debtors believe the projections to be accurate based upon current revenues. The Debtors do not intent to dramatically alter the current expenses and has projected only moderate growth over the Plan term.

6.3 Notwithstanding anything contained herein, the Reorganized Debtors shall have the right to request the Court to disallow any claim of any Entity from which property is recoverable under Sections 542, 543, 550, and 553 of title 11, or that is a transferee of a transfer avoidable under Sections 544, 545, 548, or 549 of title 11 unless such Entity or transferee has paid the amount, or turned over any such property, for which such Entity or transferee is liable.

## ARTICLE 7
## SECTION 1129(b)(2)

7.1 The Court may confirm this Plan even though less than all of the Classes of Claims and interests accept it. The requirements for confirmation of a plan over the objection of one or more classes of claims or interests are set forth in Section 1129(b) of the Code. Accordingly, Debtors, as the plan proponent, requests the Court to determine that this Plan does not discriminate unfairly, and is fair and equitable with respect to the rejecting creditor.

## ARTICLE 8
## STATUS OF EXECUTORY CONTRACTS

8.1 All unexpired leases and executory contracts shall be assumed on or before the Effective Date. To the extent there are any unexpired leases or executory contracts, which have not been assumed or dealt with in this Plan prior to the Effective Date, they are rejected. Any existing leases with tenants in any of the Retained properties are specifically assumed.

## ARTICLE 9
## EVENTS OF DEFAULT AND EFFECT THEREOF

9.1 In the event that Substantial Consummation of this Plan does not occur on or before the earlier of the Effective Date or 71 days after the Confirmation Date, the Order of Confirmation may be vacated by any party in interest, other than the Debtors.

9.2 No Claimant shall have the right to enforce any rights under this Plan until the Reorganized Debtors fails to cure any default hereunder within thirty (30) days of receipt of written notice of such default to Reorganized Debtors.

9.3. Default shall occur if one scheduled Plan payment is not made by Debtors or if current taxes are not timely paid pursuant to state law. In the event of default, any party in interest who has not received their required payment, shall send written notice of default as set forth in

section 9.2 above. Any notice of default sent by ad valorem taxing authorities, under the Plan may be sent via facsimile to William Burch 817-919-4853. In the event the default of payment to the ad valorem taxing authorities is not cured within twenty (20) days of the date of the facsimile, ad valorem taxing authorities may proceed to collect all amounts owed pursuant to state law outside of the Bankruptcy Court. The ad valorem taxing authorities shall not be required to give more than two notices of default. Upon the third event of default, the ad valorem taxing authorities shall be able to collect all amounts pursuant to state law outside of the Bankruptcy Court. Notwithstanding anything in this Plan to the contrary, the Bankruptcy Court shall not retain jurisdiction with respect to any tax claims except for (i) resolving the amount of any such tax claim arising prior to confirmation, and (ii) enforcing the discharge provision of the Plan.

## ARTICLE 10
## DISCHARGE

10.1 Upon Confirmation, to the extent that a Claim or Debt has not been dealt with under this Plan, such Claim or Debt will be released.

10.2 The automatic stay imposed by Section 362 of the Code or any preliminary injunction granted by the Court to allow for Substantial Consummation of this Plan shall remain in effect until the Effective Date.

## ARTICLE 11
## AMENDMENTS TO THE PLAN

11.1 Debtors may modify this Plan following Confirmation and before Substantial Consummation to the extent consistent with the requirements of section 1122 and 1123 of Title 11. The Plan as modified becomes the Plan if circumstances warrant modification and the Court approves of such modifications.

11.2 In the event of modification of this Plan pursuant to Section 11.1, any holder of a Claim or interest that has accepted or rejected this Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within ten (10) days of service of the Plan modifications upon such holder, such holder changes its previous acceptance or rejection.

## ARTICLE 12
## EFFECT OF CONFIRMATION

12.1 The provisions of this Plan bind Debtors, any Entity issuing securities under this Plan, any Entity acquiring property under this Plan, and any Creditor or Equity Interest Holder, whether or not the Claim or interest of such Creditor or Equity Interest Holder is impaired under the Plan and whether or not such Creditor or Equity Interest Holder has accepted this Plan.

12.2 All property of the estate is vested in the Reorganized Debtors.

In the event the case is converted to a proceeding under Chapter 7, all property of the estate will vest in the Chapter 7 trustee.

12.3 All property of the Reorganized Debtors is free and clear of all Claims and interests of Creditors and Equity Interest Holders, except as to claims, secured claims or secured debentures and interests specifically granted in this Plan.

12.4 All Debts that arose before the Confirmation Date and any Debt of a kind specified in Section 502(g), 502(h) or 502(i) of the Code, whether or not a proof of claim based on such Debt is filed or deemed filed under Section 501, whether or not such Claim is allowed under Section 502; and whether or not the holder of such Claim has accepted this Plan; are, fully and finally satisfied by this Plan.

## ARTICLE 13
## MISCELLANEOUS PROVISIONS

13.1 The obligations under this Plan to any particular Claim are governed by the laws of the State constituting the situs of the debt represented by that particular Claim described in this Plan.

13.2 Equity Interest Holders are relieved from all liability, obligation or duty to initiate or pursue any causes of action of Debtors against any Entity.

13.3 Any caption herein is for convenience only and does not affect the construction of the Plan.

13.4 Any distribution pursuant to this Plan which remains unclaimed for a period of six (6) months from the due date of such distribution is forfeited.

## ARTICLE 14
## RETENTION OF JURISDICTION

Until this case is closed, the Court retains jurisdiction of the following matters only:

14.1 To direct any necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a Transfer of property dealt with by the Plan and to perform any other act, including the satisfaction of any Lien, that is necessary for the consummation of this Plan.

14.2 To allow or disallow Claims.

14.3 To hear and determine all Claims arising from the rejection of executory contracts and unexpired leases which are included in Debtors' estate and to consummate rejection and termination thereof in connection with Debtors' estate and/or implementation of the Plan.

14.4 To liquidate damages or estimate Claims in connection with any disputed, contingent or unliquidated Claims.

14.5 To adjudicate all Claims to an ownership interest in any property of Debtors' estate.

14.6 To recover all assets and properties, including by lawsuit, of Debtors' estate wherever located.

14.7 To hear and determine Claims concerning Federal, State and local taxes pursuant to Section 346, 505, 525 and 1146 of the Code.

14.8 To hear and determine any action or proceeding brought by Debtors or the Reorganized Debtors under Section 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Code, whether such action or proceeding is brought before or after the Effective Date.

14.9 To hear and determine any core proceeding, whether such proceeding is brought before or after the Effective Date.

14.10 To determine the validity, extent and priority of all Liens and security interests against property of Debtors' estate.

14.11 To consider any modification of this Plan under Section 1127 of the Code or under Bankruptcy Rule 3020 and/or modification of this Plan after Substantial Consummation as defined herein.

14.12 To hear and determine all requests for compensation and/or reimbursement of expenses of professionals.

14.13 To hear and determine Reorganized Debtors' requests for orders as are consistent with this Plan as may be necessary or desirable to carry out the provisions thereof.

14.14 To enter an order closing this case.

Respectfully submitted,

Respectfully submitted,

William Burch

/s/ William Burch

Juanita Burch

__/s/ Juanita Burch____
Juanita Burch

ERIC LIEPINS, P.C.
ERIC LIEPINS
12770 Coit Road
Suite 1100
Dallas, Texas 75251
(972)991-5591
(972) 991-5788 - telecopier

### End of Order ###

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 6, 2010**

**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| WILLIAM & JUANITA BURCH | § | CASE 08-45761-RFN-11 |
| | § | |
| DEBTOR | § | |

**FINAL DECREE**

The Court having determined previously that there is no impediment to the entry of a Final Decree in this case; the Court finds that the estate of the above named debtor is being administered, and pursuant to Bankruptcy Rule 3022, it is

ORDERED that the chapter 11 case of the above named debtor is closed. The Debtor shall pay any outstanding United States Trustee fees within ten (10) days of this Order.

### End of Order ###

# EXHIBIT D

[redacted]

# InterestFirst℠ NOTE

November 17, 2006 [Date] Grapevine [City] TX [State]

1713 Enchanted Ln
Lancaster, TX 75146-3518
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 104,250.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Freedom Mortgage Corporation 10500 Kincaid Drive, Suite 300, Fishers, IN 46037.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 8.250 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

(A) Time and Place of Payments

I will make a payment every month. This payment will be for interest only for the first 120 months, and then will consist of principal and interest.

I will make my monthly payment on the 1st day of each month beginning on January, 2007. I will make these payments every month until I have paid all of the Principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest it will be applied to interest before Principal. If, on December 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 10500 Kincaid Drive, Suite 300, Fishers, IN 46037 or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 716.72 for the first 120 months of this Note, and thereafter will be in the amount of U.S. $ 888.28. The Note Holder will notify me prior to the date of change in monthly payment.

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment

[redacted]6737

unless the Note Holder agrees in writing to those changes. However, if the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest as well as during the time that my payments consist of principal and interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, the amount of my monthly payment will not decrease; however, the principal and the interest required under this Note will be paid prior to the Maturity Date.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest and/or principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

[redacted]3900

[redacted]6737

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.
>
> If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| | |
|---|---|
| Juanita Burch (Seal) -Borrower | (Seal) -Borrower |
| (Seal) -Borrower | (Seal) -Borrower |
| (Seal) -Borrower | (Seal) -Borrower |
| (Seal) -Borrower | (Seal) -Borrower |

*[Sign Original Only]*

[redacted]3900

EXHIBIT E

Return To:
Freedom Mortgage
Attn: Final Documents
P.O. Box 8001
Fishers, IN 46038-8001

Prepared By:

[Space Above This Line For Recording Data]

# DEED OF TRUST

MIN [redacted]737-8

## NOTICE OF CONFIDENTIALITY RIGHTS:

**If you are a natural person, you may remove or strike any of the following information from this instrument before it is filed for record in the public records: your social security number or your driver's license number.**

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated November 17, 2006 , together with all Riders to this document.

**(B) "Borrower"** is Juanita Burch , and WILLIAM P. BURCH wife and husband.

Borrower is the grantor under this Security Instrument.

**(C) "Lender"** is Freedom Mortgage Corporation

Lender is a Corporation
organized and existing under the laws of In state of New Jersey .

Lender's address is 10500 Kincaid Drive, Suite 300, Fishers, IN 46037

Lender includes any holder of the Note who is entitled to receive payments under the Note.
**(D) "Trustee"** is Calvin C. Mann, Jr.
. Trustee's address is
4900 Woodway Drive, Suite 650, Houston, TX 77056

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is a beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F) "Note"** means the promissory note signed by Borrower and dated November 17, 2006.
The Note states that Borrower owes Lender One Hundred Four Thousand Two Hundred Fifty and 00/100 Dollars (U.S. $104,250.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than December 1, 2036.
**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [ ] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [xx] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(M) "Escrow Items"** means those items that are described in Section 3.
**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of Dallas :

[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]

LOT 42 OF ENCHANTED FOREST, AN ADDITION TO THE CITY OF LANCASTER, DALLAS COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF RECORDED IN VOLUME 141, PAGE 1994, OF THE MAP RECORDS OF DALLAS COUNTY, TEXAS.

Parcel ID Number: 3602650000042000 which currently has the address of
1713 Enchanted Ln [Street]
Lancaster [City], Texas 75146-3518 [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and

assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. For the purposes of this Section 22, the term "Lender" includes any holder of the Note who is entitled to receive payments under the Note.**

**If Lender invokes the power of sale, Lender or Trustee shall give notice of the time, place and terms of sale by posting and filing the notice at least 21 days prior to sale as provided by Applicable Law. Lender shall mail a copy of the notice to Borrower in the manner prescribed by Applicable Law. Sale shall be made at public venue. The sale must begin at the time stated in the notice of sale or not later than three hours after that time and between the hours of 10 a.m. and 4 p.m. on the first Tuesday of the month. Borrower authorizes Trustee to sell the property to the highest bidder for cash in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying indefeasible title to the Property with covenants of general warranty from Borrower. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**If the Property is sold pursuant to this Section 22, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at that sale. If possession is not surrendered, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession or other court proceeding.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall provide a release of this Security Instrument to Borrower or Borrower's designated agent in accordance with Applicable Law. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee; Trustee Liability.** All rights, remedies and duties of Trustee under this Security Instrument may be exercised or performed by one or more trustees acting alone or together. Lender, at its option and with or without cause, may from time to time, by power of attorney or otherwise, remove or substitute any trustee, add one or more trustees, or appoint a successor trustee to any Trustee without the necessity of any formality other than a designation by Lender in writing. Without any further act or conveyance of the Property the substitute, additional or successor trustee shall become vested with the title, rights, remedies, powers and duties conferred upon Trustee herein and by Applicable Law.

Trustee shall not be liable if acting upon any notice, request, consent, demand, statement or other document believed by Trustee to be correct. Trustee shall not be liable for any act or omission unless such act or omission is willful.

**25. Subrogation.** Any of the proceeds of the Note used to take up outstanding liens against all or any part of the Property have been advanced by Lender at Borrower's request and upon Borrower's representation that such amounts are due and are secured by valid liens against the Property. Lender shall be subrogated to any and all rights, superior titles, liens and equities owned or claimed by any owner or holder of any outstanding liens and debts, regardless of whether said liens or debts are acquired by Lender by assignment or are released by the holder thereof upon payment.

**26. Partial Invalidity.** In the event any portion of the sums intended to be secured by this Security Instrument cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby.

**27. Purchase Money; Owelty of Partition; Renewal and Extension of Liens Against Homestead Property; Acknowledgment of Cash Advanced Against Non-Homestead Property. Check box as applicable:**

☐ **Purchase Money.**
The funds advanced to Borrower under the Note were used to pay all or part of the purchase price of the Property. The Note also is primarily secured by the vendor's lien retained in the deed of even date with this Security Instrument conveying the Property to Borrower, which vendor's lien has been assigned to Lender, this Security Instrument being additional security for such vendor's lien.

☐ **Owelty of Partition.**
The Note represents funds advanced by Lender at the special instance and request of Borrower for the purpose of acquiring the entire fee simple title to the Property and the existence of an owelty of partition imposed against the entirety of the Property by a court order or by a written agreement of the parties to the partition to secure the payment of the Note is expressly acknowledged, confessed and granted.

☐ **Renewal and Extension of Liens Against Homestead Property.**
The Note is in renewal and extension, but not in extinguishment, of the indebtedness described on the attached Renewal and Extension Exhibit which is incorporated by reference. Lender is expressly subrogated to all rights, liens and remedies securing the original holder of a note evidencing Borrower's indebtedness and the original liens securing the indebtedness are renewed and extended to the date of maturity of the Note in renewal and extension of the indebtedness.

[xx] **Acknowledgment of Cash Advanced Against Non-Homestead Property.**
The Note represents funds advanced to Borrower on this day at Borrower's request and Borrower acknowledges receipt of such funds. Borrower states that Borrower does not now and does not intend ever to reside on, use in any manner, or claim the Property secured by this Security Instrument as a business or residential homestead. Borrower disclaims all homestead rights, interests and exemptions related to the Property.

**28. Loan Not a Home Equity Loan. The Loan evidenced by the Note is not an extension of credit as defined by Section 50(a)(6) or Section 50(a)(7), Article XVI, of the Texas Constitution. If the Property is used as Borrower's residence, then Borrower agrees that Borrower will receive no cash from the Loan evidenced by the Note and that any advances not necessary to purchase the Property, extinguish an owelty lien, complete construction, or renew and extend a prior lien against the Property, will be used to reduce the balance evidenced by the Note or such Loan will be modified to evidence the correct Loan balance, at Lender's option. Borrower agrees to execute any documentation necessary to comply with this Section 28.**

[redacted]3901 Initials: [redacted]6737

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_______________ (Seal)
Juanita Burch -Borrower

_______________ (Seal)
WILLIAM P. BURCH -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

STATE OF TEXAS
County of Tarrant

Before me Gretchen L. Wrynn on this day personally appeared Juanita Burch & William P. Burch,

known to me (or proved to me on the oath of
or through ) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she/they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this day of .

(Seal)

Notary Public

My Commission Expires:

# CONSTABLE'S RETURN

**Style of Case:** **WILLIAM PAUL BURCH VS. JP MORGAN CHASE BANK N.A.**

**Came into hand, this** 18 day of FEBRUARY ,20 19 AT 10:37 o'clock A M. by executing and delivering a CITATION issued out of the state of TEXAS under cause number: CC-19-00988-C 19 day FEBRUARY , 20 19 , at 3:40 o'clock P M., to:

☐ ______ personally delivered/served true and correct copies of same.

**OTHER NOTES:** ______

☐ ______ pursuant to Rule 106/Rule 536, to an occupant: ______ over the age of 16 years.

☐ ______ pursuant to Rule 106/Rule 536, by securely attaching and/or affixing to the ______ of the defendant's last known place of ☐ business ☐ abode.

☐ **JP MORGAN CHASE BANK N.A.** ☐ **A Corporation** ☐ **A Business**

**Name:** **C T CORPORATION SYSTEM** ☐ **President** ☐ **Vice-President** ☒ **Registered Agent**

☒ **By delivering to the defendant's registered agent for service, C.T. CORPORATION SYSTEM, through Their authorized agent to accept service: MELISSA TORRES SOP INTAKE ASSOCIATE**

**at 1999 BRYAN ST STE 900 Dallas, Texas 75201.**

**Service Address:** **1999 BRYAN ST STE 900 DALLAS TEXAS 75201**

☐ **RETURNED TO COURT AND/OR PLAINTIFF FOR THE FOLLOWING REASONS:**

______

**Service Fees: $** 80.00

[signature] #135

**M. JOHNSON #135 DEPUTY CONSTABLE**
**TRACEY L. GULLEY, CONSTABLE**
**DALLAS COUNTY PRECINCT 1**

**COUNTY OF DALLAS**

**STATE OF TEXAS**

**SIGNED AND SWORN BY SAID** ______ **,before me, this** ______

**Day Of** ______ **20** ____ **, to certify which, witness my hand and seal of office.**

**NOTARY PUBLIC-IN AND FOR THE STATE OF TEXAS**

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS

2019 FEB 27 AM 11: 17

009011

# THE STATE OF TEXAS
# CITATION

CAUSE NO. CC-19-00988-C
COUNTY COURT AT LAW NO. 3
Dallas County, Texas

FILED
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY, TEXAS
2019 FEB 27 AM 11: 17

**TO:**

**JP MORGAN CHASE BANK N.A.**
**SERVE ITS REGISTERED AGENT**
**CT CORPORATION SYSTEM**
**1999 BRYAN STREET SUITE 900**
**DALLAS TX 75201**

"You have been sued. You may employ an attorney. If you or your Attorney do not file a WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and PLAINTIFF'S ORIGINA; PETITION FOR QUIET TITLE, a default judgment may be taken against you." Your answer should be addressed to the clerk of County Court at Law No. 3 of Dallas County, Texas at the Court House of said County, 600 Commerce Street, Suite 101, Dallas, Texas 75202.

RECEIVED
CONSTABLE OFFICE PCT
2019 FEB 18 AM 10: 37
7201 S POLK ST
DALLAS, TEXAS

**WILLIAM PAUL BURCH**
***Plaintiff(s)***

**VS.**

**JP MORGAN CHASE BANK N.A.**
***Defendant(s)***

filed in said Court on the 14th day of February, 2019a copy of which accompanies this citation.

**WITNESS: JOHN F. WARREN**, Clerk of the County Courts of Dallas County, Texas. GIVEN UNDER MY HAND AND SEAL OF OFFICE, at Dallas, Texas, and issued this 15th day of February, 2019 A.D.

JOHN F. WARREN, Dallas County Clerk

By Guisla Hernandez, Deputy
Guisla Hernandez

COUNTY COURT OF DALLAS COUNTY, TEXAS
TEXAS

**PCT 1**

**CITATION**
**PLAINTIFF'S ORIGINA; PETITION FOR QUIET TITLE**

**CC-19-00988-C**

IN THE COUNTY COURT OF DALLAS
County Court at Law No. 3
Dallas County, Texas

WILLIAM PAUL BURCH, ***Plaintiff(s)***

**VS.**

JP MORGAN CHASE BANK N.A.,
***Defendant(s)***

**SERVE:**
**JP MORGAN CHASE BANK N.A.**
**SERVE ITS REGISTERED AGENT**
**CT CORPORATION SYSTEM**
**1999 BRYAN STREET SUITE 900**
**DALLAS TX 75201**

**ISSUED THIS**
**15TH DAY OF FEBRUARY, 2019**

JOHN F. WARREN, COUNTY CLERK
BY: GUISLA HERNANDEZ, DEPUTY

Attorney for Plaintiff- Pro Se

WILLIAM PAUL BURCH
5947 WATERFORD DR
PO BOX 201236
ARLINGTON TX 76006
817-919-4853

OFFICER'S FEES HAVE BEEN COLLECTED
BY DALLAS COUNTY CLERK

## OFFICER'S RETURN

CC-19-00988-C County Court at Law No. 3

WILLIAM PAUL BURCH vs. JP MORGAN CHASE BANK N.A.

**ADDRESS FOR SERVICE:**
SERVE ITS REGISTERED AGENT CT CORPORATION SYSTEM
1999 BRYAN STREET SUITE 900
DALLAS TX 75201

**Fees:**
Came to hand on the _____ day of FEB 18 2019, 20_______, at _____ o'clock _____.m., and executed in ____________ County, Texas by delivering to JP MORGAN CHASE BANK N.A. in person, a true copy of this Citation together with the accompanying copy of the PLAINTIFF'S ORIGINA; PETITION FOR QUIET TITLE with the date and service at the following times and places to-wit:

| Name | Date/Time | Place, Course and Distance from Courthouse |
|---|---|---|
| | | |
| | | |

And not executed as to the defendant(s). ______________________________

The diligence used in finding said defendant(s) being:

______________________________

and the cause or failure to execute this process is:

______________________________

and the information received as to the whereabouts of said defendant(s) being:

______________________________

Serving Petition and Copy $_______ TRACEY GULLEY, CONSTABLE DALLAS COUNTY PRECINCT 1, Officer

Total $_______ ____________________, County, Texas

By:____________________, Deputy

____________________, Affiant